

**FILED**

MAR 1 5 2023

CLERK, U.S. DISTRICT COURT
TEXAS EASTERN

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| | § | No. 4:23-CR- 063 |
| v. | § | Judge Mazzant |
| | § | |
| | § | |
| MARK EXPOSITO (1) | § | |
| WILLIAM LAVIN (2) | § | |

## INDICTMENT

THE UNITED STATES GRAND JURY CHARGES:

### Introductory Allegations

At all times material to this Indictment:

1.     Defendants Mark Exposito ("**EXPOSITO**") and William Lavin
("**LAVIN**") were employed by Fenton Motor Group ("**FMG**"), a corporation
headquartered in Frisco, Texas. **FMG** was a management company that oversaw the
operation of approximately eighteen (18) car dealerships in five (5) states, including Brad
Fenton Motors of Ardmore ("**BFM**") and Fenton Nissan of Tiffany Springs ("**Fenton
Nissan-TS**").  Bradley Fenton ("**FENTON**") was the owner of **FMG** and the
corresponding car dealerships and acted as the Chief Executive Officer ("CEO").

2.      Beginning in or around April 2016, and continuing through December 2018, Defendant **EXPOSITO** was **FMG's** Chief Operating Officer ("COO") with a salary of $240,000.00 per year. **EXPOSITO's** compensation plan was determined solely by **FENTON** and at no time did **EXPOSITO's** compensation plan include "bonuses." Unindicted Co-conspirator 2 ("**UC1**") was an individual known to the Grand Jury and was **EXPOSITO**'s spouse.

3.      Beginning in or around March 2014, and continuing through December 2018, **LAVIN** was **FMG's** Chief Financial Officer ("CFO") with a salary of $240,000.00 per year. **LAVIN**'s duties, amongst other tasks, included overseeing payroll. **LAVIN's** compensation plan was determined by **FENTON** alone and at no time did **FENTON** approve or change **LAVIN's** compensation plan to include "bonuses." Unindicted Co-conspirator 1 ("**UC2**") was an individual known to the Grand Jury and was Lavin's spouse.

4.      **FENTON, FMG, BMG, Fenton Nissan-TS** and individual car dealerships alleged herein (hereinafter, collectively referred to as **"Victims"**) were individuals and businesses known to the Grand Jury and were either victimized by the scheme and acts alleged in this indictment.

5.      Ethos Group ("**ETHOS**") was a company which sold vehicle service warranties and provided auto-dealerships with funding. **FMG** and **Victims** entered into a business relationship with **ETHOS** whereby **ETHOS** paid **FMG** $750 per vehicle

service contract sold by **Victim** dealerships. **ETHOS** payments to **FMG** were determined by the number of individual sales of vehicles at the **Victim** dealerships and at no time were **EXPOSITO's** or **LAVIN's** duties at **FMG** connected to these sales. Prior to hiring **EXPOSITO**, **FENTON** directed **ETHOS** payments be made directly to **FMG** to be used as management fees by **FMG**.

6.    Automatic Data Processing **("ADP")** was a web-based, third-party payroll vendor used by **FMG** and **Victims** to facilitate the payment of wages to employees, either by direct deposit or by check, based upon the information it received from **LAVIN** or those under his supervision. At all times **LAVIN** and **EXPOSITO** knew that **FMG** and **Victims** were required by law to track and document all wages paid to employees, including bonuses, for IRS tax purposes. At all times **LAVIN** and **EXPOSITO** knew that employee wage payments and bonus payments made by **FMG** and **Victims** via **ADP** were tracked by **ADP** for IRS tax purposes, including the creation of IRS tax forms W-2 ("W-2") and 1099 ("**1099**"), which document the total wages and bonuses paid to individual employees each year. At all times **LAVIN** and **EXPOSITO** knew that W-2's and 1099's generated by **ADP** were sent to **FENTON** and/or his accountant for review, as well as the individual employee and the IRS to ensure the full payment of taxes owed. At all times **LAVIN** and **EXPOSITO** knew that bonus payments made to an employee were considered income for IRS tax purposes and that any "bonus payments" made outside **FMG's ADP** payroll system would not be documented as wages paid on a W-2

or non-employee compensation on a 1099 and would need to be reported to ADP or FMG's accountant to ensure they were included on an IRS Form 1099 as non-employee compensation for the employee.

7.    Circle E Ranch, LLC ("**CircleE**") and Expo Motor Group ("**EMG**") were business entities created by **EXPOSITO** and used by him to further the scheme to defraud.

8.    **E.M.**, an individual known to the Grand Jury, owned and operated Chic Limo and SM Car Sales Taxicab & Limousine (together "**CHIC LIMO**"), a luxury personal transportation service. No **FMG** employee, including **EXPOSITO** and **LAVIN**, were permitted to have a driver or driver service.  Uber was permitted for business transports to and from the airport. **E.M.** had no affiliation with **FMG** prior to **EXPOSITO** becoming COO and was not at any time an **FMG** employee.

9.    **R.W.**, an individual known to the Grand Jury, was employed with **FMG** as a receptionist from 2015 to 2017 and worked primarily out of **FMG's** corporate office in Frisco, Texas. **R.W.** was a Notary Public with the ability to notarize and certify records under oath. At no time was **R.W.** permitted to notarize **FENTON's** signature outside of his presence. At no time did **R.W.'s** duties include the authority to access **FMG** bank accounts or the ability to authorize or cause ACH wire transfers of funds.

10.    BancFirst ("BancFirst"), Wells Fargo Bank ("Wells Fargo"), Prosperity Bank ("Prosperity"), and American Express Bank ("AMEX"), (collectively "Financial

Institutions"), were financial institutions insured by the Federal Deposit Insurance Corporation ("FDIC").

11.    BottomLine Technologies ("BottomLine") and Jack Henry and Associates ("Jack Henry") are technology companies that provide online banking services, including the processing of Automated Clearinghouse ("ACH") transactions.

12.    BottomLine provided online banking services to BancFirst, to include the online banking interface and the processing of ACH transactions.  The servers maintained by BottomLine for these purposes were physically located in Virginia.

13.    Jack Henry provided online banking services to Prosperity Bank, to include the online banking interface and the processing of ACH transactions.  The servers maintained by Jack Henry for these purposes were physically located in Lenexa, Kansas, and Allen, Texas.

14.    Wells Fargo maintained ACH transaction servers in Minnesota.

## Count One

Violation: 18 U.S.C. § 1349
(Conspiracy to Wire Fraud)

### A.    The Conspiracy

15.    Beginning in or around April 2016, the exact date of which being unknown to the Grand Jury, and continuing thereafter up until the date of the filing of this indictment, in the Eastern District of Texas and elsewhere, **MARK EXPOSITO and WILLIAM LAVIN**, defendants, did intentionally, knowingly, and willfully combine, conspire, and agree with other persons known and unknown to the United States Grand Jury, (hereinafter "co-conspirators") to devise a scheme and artifice to defraud the **Victims** and obtain money, funds, assets, credits, securities and property owned by, or under the custody and control of, the Victims by means of materially false and fraudulent pretenses and representations, and for the purpose of executing such scheme and artifice, did knowingly transmit and cause to be transmitted by means of wire communications in interstate commerce, any writings, signs, signals, and sounds, in violation of 18 U.S.C. § 1343.

### B.    Manner and Means of the Conspiracy

Among the manner and means by which **EXPOSITO** and **LAVIN** carried out the object of the conspiracy were the following:

16.     During the course of the conspiracy, **EXPOSITO** and **LAVIN,** using ACH transactions, interstate wire transfers, and business checks, caused fraudulent money transfers from the **Victims'** accounts to bank accounts held by **EXPOSITO** and **LAVIN** in excess of $28,000,000.00. As detailed below, the defendants endeavored to conceal the nature and source of these funds, but in the end, **EXPOSITO, LAVIN,** and their spouses **UC1** and **UC2,** fraudulently enriched themselves with approximately $8,000,000.00 in stolen **FMG** and **Victim** funds, which they used to unlawfully pay off personal credit card purchases and purchase real estate, vehicles, jewelry, designer clothing, and first-class travel.

**Specific Acts:**

17.     **LAVIN** gave himself the ability to make ACH money transfers from **FMG** accounts without review or approval by **FENTON.** Specifically, on or about November 4, 2015, **LAVIN,** in his capacity as **FMG** CFO, requested two-party authorization from BancFirst for all ACH transfers of **FMG** funds held by BancFirst. **LAVIN** then used **R.W.'s** email and computer to create a second authorization account. **LAVIN** then used **R.W.'s** account to approve **LAVIN's** fraudulent ACH transfers, creating the illusion that the ACH transfers had been vetted and approved by **R.W.**

18.     **EXPOSITO** and **LAVIN** concocted a plan to steal **FMG** funds using **ETHOS** "overfund" payments to **FMG** as cover. Specifically, **EXPOSITO** and **LAVIN**

created a secret, unapproved and fraudulent "bonus payment" structure for themselves without **FENTON**'s knowledge or consent, and which they intended to use to explain their sudden substantial and unwarranted wealth should their fraudulent activity be discovered.

19.    In or around April 2016, **LAVIN** began making large "bonus payment" money transfers from **FMG** and **Victims'** accounts to bank accounts owned by **EXPOSITO** and **LAVIN**. To conceal from **FENTON** the true nature of these fraudulent "bonus payments" and to avoid the creation of an IRS form 1099, **LAVIN** made the "bonus payments" to himself and **EXPOSITO** via ACH wire transfers directly from **FMG** accounts instead of using the **ADP** payroll system. During the course of the conspiracy, at no time did **EXPOSITO** or **LAVIN** report receiving a "bonus payment" to **ADP** or to **FMG's** accountant. Thus, the payments were never documented and no 1099's were issued. Neither **EXPOSITO** nor **LAVIN** ever paid federal income taxes on the fraudulent money received.

20.    **EXPOSITO** and **LAVIN** fraudulently leased apartments for their personal use without **FENTON**'s knowledge or consent and used **FMG** funds to make the lease payments. **LAVIN** forged **FENTON's** signature on an apartment lease application and then instructed **R.W.** to notarize **FENTON's** signature without **FENTON's** knowledge and outside of his presence.

21.      **EXPOSITO** opened American Express ("AMEX") business credit cards using the names of **FMG** ("**FMG AMEX**") and **Circle E Ranch** ("**Circle E AMEX**"), which were then used by **EXPOSITO**, **LAVIN**, **UC1**, **UC2**, and "favored" **FMG** employees for both personal and business expenses. **EXPOSITO** caused all credit card bills to be sent to his personal residence. **EXPOSITO** and **LAVIN** would fraudulently transfer **FMG** and **Victims'** funds to **EXPOSITO's** personal Wells Fargo bank account via interstate **ACH** wire transfers. **EXPOSITO** would then use the **FMG** and **Victim** funds received to fully pay the AMEX bills, including all amounts incurred as personal expenses. **EXPOSITO** also made AMEX payments to his personal business entity, **CircleE**, which he then paid off using **FMG** funds. During the course of the conspiracy, **EXPOSITO**, **LAVIN**, and their spouses, **UC1** and **UC2**, used the **Victims'** funds to pay for over $3,000,000.00 in personal AMEX purchases. The personal AMEX charges were spent on jewelry, designer clothing, high-end goods and services, first class international airline tickets, and miscellaneous personal expenses. Examples include:

   a.  **November 22, 2017, Circle E AMEX payment of $722,420.09:**

         i.  On or about October 24, 2017, **UC2** used the **Circle E AMEX** to make a $21,464.58 purchase from "J. Randall Designs."

        ii.  On or about October 30, 2017, **UC1** used the **Circle E AMEX** to make a $14,285.55 purchase from "Trunk Club."

    iii.  On or about November 22, 2017, $693,923.73 was transferred from **FMG's** BancFirst account into **EXPOSITO's** personal Wells Fargo account via ACH. **LAVIN** labeled this ACH transfer as "Store Expenses – Need to Spread" in the **FMG** Quickbooks Ledger.

    iv.  On or about November 22, 2017, **EXPOSITO** used these funds to make a $722,420.09 payment on the **Circle E AMEX** bill from his personal account.

**b.** **April 10, 2018, Circle E AMEX payment of $285,465.06:**

    i.  On or about March 6, 2018, **EXPOSITO** used the **Circle E AMEX** to make a $20,015.00 purchase from "LS Performance Horses."

    ii.  On or about April 10, 2018, $295,468.81 was transferred from **FMG's** BancFirst account into **EXPOSITO's** personal Wells Fargo account via ACH. **LAVIN** labeled this ACH transfer as "3-18 Store Expenses" in the FMG Quickbooks Ledger.

    iii.  On or about April 10, 2018, **EXPOSITO** used these funds to make a $285,465.06 payment on the **Circle E AMEX** bill from his personal account.

**c.** **June 9, 2018, FMG AMEX payment of $110,114.26:**

i.   On or about April 28, 2018, **LAVIN** used the **FMG AMEX** to make an $11,531.66 purchase from "Home Market Interiors."

ii.   On or about May 16, 2018, **UC2** made a $12,665.25 purchase from "Home Market Interiors."

iii.   On or about June 11, 2018, $110,114.26 was transferred from **Fenton Nissan-TS** directly to AMEX. **LAVIN** directed the payment be labeled as "AMEX EPayments" in the **Fenton Nissan-TS** Ledger.

d.   **July 24, 2018, FMG AMEX payment of $455,415.95:**

i.   On or about June 27, 2018, **LAVIN** used the **FMG AMEX** to make a $6815.21 purchase from "Christian Lou Boutin."

ii.   On or about June 29, 2018, **EXPOSITO** used the **FMG AMEX** to make a $32,134.69 purchase from "Hays Trailers."

iii.   On or about July 2, 2018, **UC1** used the **FMG AMEX** to make a $30,249.83 purchase from "Adorne Interiors."

iv.   On or about July 18, 2018, **UC1** used the **FMG AMEX** to make a $9,900.00 purchase from "Brockway Equipment & Fabrication."

v.   On or about July 24, 2018, $455,415.95 was paid directly from **FMG's** BancFirst account to AMEX via ACH. **LAVIN** labeled

this ACH transfer as "Loan to Brad Fenton" in **FMG's** Quickbooks Ledger.

    **e.  September 20, 2018, Circle E AMEX payment of $100,000.00:**

        i.  Between September 8, 2018, and September 12, 2018, **EXPOSITO** used the **Circle E AMEX** to purchase nearly $100,000.00 in airlines tickets from "Emirates Airlines" and "American Airlines" for himself and **UC1**.

        ii.  On or about September 14, 2018, $100,000.00 was transferred from **BFM's** account into **EXPOSITO's** personal Wells Fargo account via wire transfer. **LAVIN** directed this wire transfer be labeled as "Wire Exposito AMEX" in the BFM Ledger.

        iii.  On or about September 20, 2018, **EXPOSITO** used these funds to make a $100,000.00 payment on the **Circle E AMEX** from his personal account.

22.  **LAVIN**, as CFO, would use his position to disguise and conceal the true nature of the transactions within the books and records of the **Victim** companies by falsely recording them in the **FMG** QuickBooks general ledger as bonafide business expenses. **LAVIN** would disguise and conceal the personal payments by recording the payments as being paid to bonafide vendors, charged as "store expenses," and/or recording them as loans to **FENTON**.

23.     **EXPOSITO** and **LAVIN** fraudulently engaged the luxury personal transportation services of **E.M.'s CHIC LIMO** without the knowledge or consent of **FENTON**. **EXPOSITO** and **LAVIN** fraudulently and secretly added **E.M.** to **FMG**'s health insurance rolls without the knowledge or permission of **FENTON**. During the course of the conspiracy, **EXPOSITO, LAVIN, UC1** and **UC2,** using the AMEX cards opened by **EXPOSITO**, paid **E.M.** and **CHIC LIMO** more than $300,000.00 for personal driving services, which were then paid off using **FMG** and **Victims'** funds.

24.     To perpetuate their fraud and avoid detection, **EXPOSITO** and **LAVIN** systematically alienated, demoted and "pushed out" employees and business partners who were seen as loyal to **FENTON**. Individuals who could be manipulated, bribed or seen as loyal to **EXPOSITO** were considered "favored" and given preferential treatment.

25.     **EXPOSITO** and **LAVIN**'s actions of repeated wire transfers and money maneuvers were highly suspect and placed the financial health of the **Victims** in dire jeopardy on numerous occasions. Their actions raised questions from dealership co-owners and management. When **Victim** dealerships were out of money and the co-conspirators' fraudulent activity on the verge of being exposed, **EXPOSITO** and **LAVIN** would transfer portions of the stolen funds back to the **Victims** to keep business operations viable. They fraudulently labeled these transfers as "loans," for which they would later be "re-imbursed." In private, **EXPOSITO** and **LAVIN** blamed the cash shortage on **FENTON** and accused him of embezzlement and poor management. They

then took credit for keeping the dealerships afloat with their fake "loans," further alienating **FENTON** from dealership management and business partners and setting up their defense in the event their fraud came to light. This allowed the defendants to obfuscate their fraudulent activity and misdirect unwanted attention while "playing both sides against the other."

26.    Knowing **FENTON** was nearing retirement age and looking to sell **FMG** and the dealerships, and in order to conceal their fraudulent activities, **EXPOSITO** and **LAVIN** created in **FENTON** a false sense of security by such means as:

a.    **EXPOSITO** convinced **FENTON** he wanted to purchase **FMG** and its assets from **FENTON** and that he was in the process of obtaining outside investor funding to do so.

b.    **EXPOSITO** and **LAVIN** instructed subordinates and other **FMG** stakeholders to bring any problems, issues or complaints directly to them instead of **FENTON**, and to avoid copying **FENTON** on emails.

c.    When **FENTON** learned of problems and made inquiries, **EXPOSITO** and **LAVIN** made material omissions as to the nature and source of the problems while they also made repeated assurances that problems were being handled properly and that **FENTON** should not be concerned.

All in violation of 18 U.S.C. § 1349.

## Counts Two through Twenty-Three

<u>Violation:</u> 18 U.S.C. § 1343
(Wire Fraud)

27.     Beginning on or about April 1, 2016 and continuing through on or about December 31, 2018, in the Eastern District of Texas and elsewhere, **MARK EXPOSITO** and **WILLIAM LAVIN**, defendants, along with persons known and unknown to the United States Grand Jury, aided and abetted by each other, did devise and intend to devise a scheme and artifice to defraud, and obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, a violation of 18 U.S.C. § 1343.

28.     The scheme and artifice to defraud is described above in paragraphs 16-26 of Count One, which are incorporated herein for all purposes.

29.     On or about each of the dates set forth below, in the Eastern District of Texas and elsewhere, **EXPOSITO** and **LAVIN**, along with persons known and unknown to the United States Grand Jury, aided and abetted by each other, for the purpose of executing and attempting to execute the scheme described above, caused to be transmitted by means of wire communication in interstate commerce the signals and sounds described below for each count, each transmission constituting a separate count, and each affecting a financial institution:

| Count | Date | Description |
|---|---|---|
| 2 | 5/13/2016 | ACH funds transfer of $14,400.24 from FMG BancFirst account #XX3444 to Lavin's Prosperity Bank account #XX7515. Lavin recorded this payment as "Ethos Payout" in the General Ledger. |
| 3 | 5/13/2016 | ACH funds transfer of $15,275.91 from FMG BancFirst account #XX3444 to Exposito's Wells Fargo Bank account #XX8111. Lavin recorded this payment as "Ethos Payout" in the General Ledger. |
| 4 | 9/12/2016 | ACH funds transfer of $39,420.00 from FMG BancFirst account #XX3444 to Lavin's Prosperity Bank account #XX7515. Lavin recorded this payment as "9-16 CDK Invoices" in the General Ledger. |
| 5 | 9/12/2016 | ACH funds transfer of $39,420.00 from FMG FMG BancFirst account #XX3444 to Exposito's Wells Fargo Bank account #XX8111. Lavin recorded this payment as "9-16 CDK Invoices" in the General Ledger. |
| 6 | 10/14/2016 | ACH funds transfer of $36,675.00 from FMG BancFirst account #XX3444 to Lavin's Prosperity Bank account #XX7515. Lavin recorded this payment as "10-16 CDK Computer Invoices" in the General Ledger. |
| 7 | 10/14/2016 | ACH funds transfer of $36,675.00 from FMG BancFirst account #XX3444 to Exposito's Wells Fargo Bank account #XX8111. Lavin recorded this payment as "10-16 CDK Computer Invoices" in the General Ledger. |
| 8 | 4/17/2017 | ACH funds transfer of $77,593.25 from FMG BancFirst account #XX3444 to Lavin's Prosperity Bank account |

MARK EXPOSITO and WILLIAM LAVIN INDICTMENT

| | | |
|---|---|---|
| | | #XX7515. Lavin recorded this payment as "4-17 CDK Invoice" in the General Ledger. |
| 9 | 4/17/2017 | ACH funds transfer of $77,593.25 from FMG BancFirst account #XX3444 to Exposito's Wells Fargo Bank account #XX8111. Lavin recorded this payment as "4-17 CDK Invoice" in the General Ledger. |
| 10 | 6/23/2017 | ACH funds transfer of $68,453.71 from FMG BancFirst account #XX3444 to Lavin's Prosperity Bank account #XX7515. Lavin recorded this payment as "6-17 CDK" in the General Ledger. |
| 11 | 6/23/2017 | ACH funds transfer of $68,453.71 from FMG BancFirst account #XX3444 to Exposito's Wells Fargo Bank account #XX8111. Lavin recorded this payment as "6-17 CDK" in the General Ledger. |
| 12 | 7/27/2017 | ACH funds transfer of $171,000.00 from FMG BancFirst account #XX3444 to Lavin's Prosperity Bank account #XX7515.  Lavin recorded this payment as "Suspense Entry" in the General Ledger. |
| 13 | 10/10/2017 | ACH funds transfer of $64,194.00 from FMG BancFirst account #XX3444 to Exposito's Wells Fargo Bank account #XX8111. Lavin recorded this payment as "9-18 Computer Services, Google, DealerTrack" in the General Ledger. |
| 14 | 10/10/2017 | ACH funds transfer of $87,194.00 from FMG BancFirst account #XX3444 to Lavin's Prosperity Bank account #XX7515. Lavin recorded this payment "9-18 computer Services, Google, DealerTrack" in the General Ledger. |
| 15 | 2/16/2018 | ACH funds transfer of $548,450.00 from FMG BancFirst account #XX3444 to Exposito's Wells Fargo Bank |

MARK EXPOSITO and WILLIAM LAVIN INDICTMENT

| | | account #XX8111. Lavin recorded this payment as "Store Expenses" in the General Ledger. |
|---|---|---|
| 16 | 4/10/2018 | ACH funds transfer of $72,325.00 from FMG BancFirst account #XX3444 to Lavin's Prosperity Bank account #XX7515. Lavin recorded this payment as "3-18 Store Expenses" in the General Ledger. |
| 17 | 4/10/2018 | ACH funds transfer of $133,207.92 from FMG BancFirst account #XX3444 to Exposito's Wells Fargo Bank account #XX8111. Lavin recorded this payment as "3-18 Store Expenses" in the General Ledger. |
| 18 | 5/7/2018 | ACH funds transfer of $68,070.00 from FMG BancFirst account #XX3444 to Lavin's Prosperity Bank account #XX7515. Lavin recorded this payment as "Loan to Brad Fenton" in the General Ledger. |
| 19 | 5/7/2018 | ACH funds transfer of $63,870.00 from FMG BancFirst account #XX3444 to Exposito's Wells Fargo Bank account #XX8111. Lavin recorded this payment as "Loan to Brad Fenton" in the General Ledger. |
| 20 | 5/11/2018 | ACH funds transfer of $60,000.00 from FMG BancFirst account #XX3444 to Lavin's Prosperity Bank account #XX7515. Lavin recorded this payment as "Loan to Brad Fenton" in the General Ledger. |
| 21 | 5/11/2018 | ACH funds transfer of $60,000.00 from FMG BancFirst account #XX3444 to Exposito's Wells Fargo Bank account #XX8111. Lavin recorded this payment as "Loan to Brad Fenton" in the General Ledger. |

| 22 | 7/13/2018 | ACH funds transfer of $60,925.00 from FMG BancFirst account #XX3444 to Lavin's Prosperity Bank account #XX7515.  Lavin recorded this payment as "Loan to Brad Fenton" in the General Ledger. |
| 23 | 7/13/2018 | ACH funds transfer of $60,925.00 from FMG BancFirst account #XX3444 to Exposito's Wells Fargo Bank account #XX8111.  Lavin recorded this payment as "Loan to Brad Fenton" in the General Ledger. |

All in violation of 18 U.S.C. § 1343.

## <u>NOTICE OF INTENT TO SEEK CRIMINAL FORFEITURE</u>

<u>Pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461, and 18 U.S.C. §§§ 982(a)(1), 982(a)(2)(A), and 982(a)(2)(B)</u>

As the result of committing the offenses alleged in this Indictment, the defendants shall forfeit to the United States pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461, and 18 U.S.C. §§§ 982(a)(1), 982(a)(2)(A), 982(a)(2)(B) all property, real or personal, that constitutes or is derived from proceeds traceable to the aforementioned offense including but not limited to the following:

## **<u>EXPOSITO and UC1:</u>**

<u>Real Property:</u>

  a.  24955 N. Sage Haven Drive, Paulden, AZ (Yavapai County Parcel 305-01-008)
  b.  N. Calico Lane, (2.2 Acres) Paulden, AZ (Yavapai County Parcel 305-01-012A)
  c.  E. Cougar Ridge Road, (8 Acres) Paulden, AZ (Yavapai County Parcel 305-01-007K)
  d.  24975 N. Calico Lane, Paulden, AZ (Yavapai County Parcel 305-01-003K)
  e.  N. Sage Haven (N. Camino Del Reino), Paulden, AZ (Yavapai County Parcel 305-01-002Q)

<u>Personal Property:</u>

  f.  a Tiffany platinum band with a full circle of round brilliant diamonds, 3.9 mm wide, and a 1.80 carat total weight; and
  g.  a Tiffany diamond ring with a 2.34 carat Cut Cornered Rectangular VVS2 stone

MARK EXPOSITO and WILLIAM LAVIN INDICTMENT

**LAVIN and UC2:**

Personal Property:

a.  Loose Round Brilliant Diamond, GIA 2175803140 4.01 I SI 1;
b.  Platinum Diamond Eternity Band, 26=2.6CT FG VS Emerald Cut Diamond Shared Prong Size 10.5;
c.  18KYG/White Gold Roberto Coin Pave Diamond POIS MOI Cufflinks;
d.  Trill Matched Pair Special Order Diamond, 44125868 1.65 CTTW FY VS2;
e.  Plat Emerald Cut Diamond Eternity Band, 24=7.44CT FG VS, Emerald Cut Diamond Shared Prong Set, SZ 10.5;
f.  Rolex 18KWG 39MM OP DateJust PearlMaster Watch, Mother Of Pearl Dial, Diamond Index, Date/Sec, Round Diamond Bezel on 5 Row Polished Pearl Master Bracelet w/Deployment Clasp;
g.  Platinum Diamond 7.5" Bracelet, 157=18.95CT EF VS PC/BG Diamond Hiacia Flex Bracelet, w/104 PC Diamonds in Rows with 2 PC DIA per Row, 52 BG Diamonds and one Trademark Diamond on Side;
h.  Diamond Studs, GIA 2173435908 & 2175715643 18KYG 1=2.08CT FIY VS2 CU, 1=2.14 CT FIY IF CU;

**Cash Proceeds**

A money judgment in United States currency and all interest and proceeds traceable thereto, in that such sum in aggregate is property constituting, or derived from, proceeds obtained directly or indirectly, as the result of the offense alleged in this Indictment.

**Substitute Assets**

If any of the property described above as being subject to forfeiture, as a result of any act or omission of the defendants –

(a)     cannot be located upon the exercise of due diligence;

(b)     has been transferred or sold to, or deposited with a third person;

(c)     has been placed beyond the jurisdiction of the court;

(d)     has been substantially diminished in value; or

(e)     has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to 21 U.S.C. § 853(p), to seek forfeiture of any other property of the defendants up to the value of the above forfeitable property, including but not limited to all property, both real and personal owned by the defendants.

By virtue of the commission of the offenses alleged in this Indictment, any and all interest the defendants have in the above-described property is vested in and forfeited to the United States.

A TRUE BILL

_____
GRAND JURY FOREPERSON

UNITED STATES ATTORNEY

*Mary Ann Coxby* /oe
MATTHEW T. JOHNSON
Assistant United States Attorney

_____
3-15-2023
Date

MARK EXPOSITO and WILLIAM LAVIN INDICTMENT

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| | § | No. 4:23-CR- |
| v. | § | Judge |
| | § | |
| | § | |
| MARK EXPOSITO (1) | § | |
| WILLIAM LAVIN (2) | § | |

## NOTICE OF PENALTY

### Count One

Violation:        18 U.S.C. § 1349
            (Conspiracy to Commit Wire Fraud)

Penalty:        Imprisonment of not more than 30 years, a fine not to exceed
            $1,000,000, or both; a term of supervised release of not more
            than 5 years.

Special Assessment: $ 100.00

### Counts Two through Twenty Three

Violation:        18 U.S.C. § 1343
            (Wire Fraud)

MARK EXPOSITO AND WILLIAM LAVIN – NOTICE OF PENALTY

Penalty:    Imprisonment of not more than 20 years, a fine not to exceed $250,000, or both; a term of supervised release of not more than 3 years.

If it is shown that the violation affected a financial institution, imprisonment of not more than 30 years, a fine not to exceed $1,000,000, or both; a term of supervised release of not more than 5 years.

Special Assessment: $ 100.00

MARK EXPOSITO AND WILLIAM LAVIN – NOTICE OF PENALTY