IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, § | |
| § | |
| Plaintiff, § | |
| § | |
| v. § | Crim. No. 4:23-63-ALM-KPJ-1 |
| § | |
| MARK EXPOSITO (1), § | |
| § | |
| Defendant. § | |
| § | |

**OPINION AND ORDER**
**OF DETENTION PENDING TRIAL**

Defendant Mark Exposito ("Defendant") is charged in an Indictment with one count of violating 18 U.S.C. § 1349 (Conspiracy to Commit Wire Fraud) and twenty-two counts of violating 18 U.S.C. § 1343 (Wire Fraud). The United States moved to detain Defendant pending trial pursuant to 18 U.S.C. § 3142(f). Upon consideration, the Court finds Defendant should be **DETAINED**.

### I. LEGAL STANDARD

"The Bail Reform Act provides that a person shall be released pending trial unless a judge finds that 'no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community.'" *United States v. Villaurrutia*, 850 F. App'x 330, 331 (5th Cir. 2021) (per curiam) (quoting 18 U.S.C. § 3142(e)). A judicial officer may order a defendant detained pending trial upon satisfying two prerequisites. First, the officer must hold a hearing pursuant to a circumstance listed in 18 U.S.C. § 3142(f). *See United States v. Byrd*, 969 F.2d 106, 109–10 (5th Cir. 1992). Only criminal defendants whose cases involve one or more of the following circumstances may be detained pending trial:

1

- a crime of violence, a violation of section 1591, or an offense listed in section 2332b(g)(5)(B) for which a maximum term of imprisonment of 10 years or more is prescribed;

- an offense for which the maximum sentence is life imprisonment or death;

- an offense for which a maximum term of imprisonment of ten years or more is prescribed in the Controlled Substances Act (21 U.S.C. § 801 *et seq.*), the Controlled Substances Import and Export Act (21 U.S.C. § 951 *et seq.*), or chapter 705 of title 46;

- any felony if such person has been convicted of two or more offenses described in subparagraphs (A) through (C) of this paragraph, or two or more state or local offenses that would have been offenses described in subparagraphs (A) through (C) of this paragraph if a circumstance giving rise to federal jurisdiction had existed, or a combination of such offenses;

- any felony that is not otherwise a crime of violence that involves a minor victim or that involves the possession or use of a firearm or destructive, or any other dangerous weapon, or involves a failure to register under 18 U.S.C. § 2250;

- any offense if there is a serious risk that such person will flee; or

- any offense if there is a serious risk that such person will obstruct or attempt to obstruct justice, or threaten, injure, or intimidate, or attempt to threaten, injure, or intimidate, a prospective witness or juror.

18 U.S.C. § 3142(f).

Second, after a hearing, the judicial officer must determine whether the United States has shown by a preponderance of the evidence that "no condition or combination of conditions will reasonably assure the appearance of the person," or by clear and convincing evidence that "no condition or combination of conditions will reasonably assure . . . the safety of any other person and the community." 18 U.S.C. § 3142(e)(1), (f)(2). Section 3142(g) provides that a court shall consider the following factors in determining whether a person poses a flight risk or a danger to the community: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence; (3) the defendant's history and characteristics, including, among other things, his family ties, length of residence in the community, past conduct, history relating to drug or alcohol abuse,

criminal history, and record concerning appearance at court proceedings; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release. 18 U.S.C. § 3142(g).

If, based on the foregoing factors, the judicial officer finds there are no conditions that would "reasonably assure the appearance of the person as required and the safety of any other person and the community," the judicial officer shall order the criminal defendant detained pending trial. 18 U.S.C. § 3142(e); *see also United States v. Okhumale*, 813 F. App'x 936, 939 (5th Cir. 2020) (per curiam) (holding pretrial detention requires "the presence of one of the circumstances outlined in § 3142(f) *and* a determination under § 3142(e) that . . . no conditions imposed could either assure the appearance of the defendant or the safety of the defendant and community" (citing *Byrd*, 969 F.2d at 109–10))).

## II. PRETRIAL SERVICES REPORT[1]

Defendant advised he was born in Kansas City, Missouri in 1967, and is approximately fifty-six (56) years old. Defendant reported he graduated from Truman High School in Independence, Missouri in 1985, and that he later attended the University of Missouri-Kansas City but did not graduate. Defendant reported he had prior residences as follows: Kansas City, Missouri from 1967 to 1991; Phoenix, Arizona from 1991 to 1994; Kansas City, Missouri from 1994 to 1998; Phoenix, Arizona from 1998 to 2018; and Paulden, Arizona from 2018 to present. Defendant reported he moved to his current residence, a three-bedroom house located on eighteen acres, in 2018, and currently lives with his wife, Shawna Exposito ("Ms. Exposito"). Defendant reported he raises horses and cattle on the property.

---

[1] A Pretrial Services Report is a concise summary and conclusion of the pretrial investigation pertaining to the pretrial release of the criminal defendant. *See* 18 U.S.C. § 3154.

Defendant reported both of his parents are deceased and he does not share a close relationship with his sister, Susan Margolis, who resides in Portland, Oregon. Defendant advised he was previously married to Brenda Waymeir from 1991 to 1993 and has two children from this marriage—Christian Exposito, age twenty-nine (29), who resides in San Antonio, Texas; and Alexandria Haley, age thirty-two (32), who resides in Okinawa, Japan. Defendant advised he married his current spouse, Ms. Exposito, in 1996, and they share one child, Mark Exposito, age twenty-six (26), who resides in Chandler, Arizona.

Defendant reported he is self-employed as the owner and operator of the Circle E Ranch at his residence in Paulden, Arizona since 2015. Defendant reported a monthly income of approximately $3,000, and that he works approximately fifty (50) hours weekly. Defendant reported previous employment as the chief operating officer ("COO") for Fenton Motor Group in Frisco, Texas from 2015 to 2019. Defendant reported he was also the general manager for Camel Back Volkswagen in Phoenix, Arizona from 1998 to 2015.[2] Defendant further reported he has the following assets: a 2022 Ford F-350 vehicle valued at $80,000; a 2022 Ford F-150 vehicle valued at $70,000; a 2022 BMW X5 vehicle valued at $55,000; approximately $150,000 in his personal savings account; and a valuation of his residence at approximately $700,000. In total, Defendant's assets are approximately $1,055,000. Defendant advised Pretrial Services that his liabilities are unknown.[3] Defendant further reported he has an estimate cash flow of approximately negative (-) $5,550 with expenses as follows: $250 in utilities; $200 for cell phone payments; $1,000 in

---

[2] In reviewing the Pretrial Services Report (Dkt. 10), Defendant does not appear to have reported his income for his previous employment. Additionally, Defendant does not appear to have reported any previous employment before 1998 and, thus, there is an approximate ten-year gap in employment.

[3] In reviewing the Pretrial Services Report (Dkt. 10), Defendant provided the financial information regarding his assets and liabilities. Defendant reported owning three vehicles, but stated he could not recall any of the balances owed on these vehicles. *See id.* at 3. Additionally, the Pretrial Services Report states his liabilities are "Unknown" and Defendant's wife, Ms. Exposito, was unable to verify the financial information in this section.

groceries and supplies; $1,500 in payments for the 2022 Ford F-350 vehicle; $1,500 in payments for the 2022 Ford F-150 vehicle; $800 in payments for the 2022 BMW X5 vehicle; $800 in payments for the auto insurance; and $2,500 in court ordered obligations.

Defendant reported he has a United States passport. Defendant reported to Pretrial Services the following travel outside the United States: Mexico in 2017 for vacation; Egypt in 2018 for business; and Dubai in 2020 for business.  Defendant advised Pretrial Services he has medical conditions related to high blood pressure and high cholesterol, and is currently taking the medication, Bystolic, to treat high blood pressure as prescribed by his physician, Dr. Son Giep in Plano, Texas. Defendant reported he had used alcohol since age nineteen (19) on a daily basis with his last use approximately five years ago.

Pretrial Services conducted a criminal record check through the National Crime Information Center ("NCIC") revealing the following arrest history: Defendant was arrested in September 1987 by Walnut Creek Police Department in Walnut Creek, California and convicted in November 1987 for Make/Pass Fictious Check and Forgery, for which he received a sentence of four years probation and 180 days confinement; Defendant was arrested in May 1998 by Johnson County Sheriff's Office in Olathe, Kansas and convicted of Theft in December 1998, for which he received two years probation; and Defendant was arrested by Peoria Police Department in Peoria, Arizona for Liquor Possession Open Container in Vehicle, Driving Under Influence – Liquor/Drugs/Vapors, Driving Under Influence with Breath Alcohol Content of 0.08 or More, Reckless Driving, and Exceed 85 Miles Per Hour, for which four charges were dismissed and he received 10 days confinement in September 2021 for Driving Under Influence – Liquor/Drugs/Vapors. Ms. Exposito verified the information provided by Defendant to Pretrial Services.

### III.   DETENTION HEARING

The Court held a detention hearing on April 4, 2023 (the "Hearing"). The United States was represented by Assistant United States Attorney Matt Johnson. Defendant was represented by Robert Reddick Smith.

Special Agent Jennifer Lapiano ("Agent Lapiano"), an agent for the Federal Bureau of Investigation ("FBI") assigned to the White Collar Squad in the Frisco, Texas resident agency, testified regarding the details of the alleged offenses and the investigation leading to Defendant's arrest.

Fenton Motor Group ("FMG") was a management company headquartered in Frisco, Texas that oversaw eighteen car dealerships across five states with several hundred employees. Brad Fenton ("Mr. Fenton") was the owner and chief executive officer ("CEO") of FMG. Defendant and his co-defendant William Lavin ("Co-Defendant Lavin") were employed by FMG as COO and chief financial officer ("CFO"), respectively. Co-Defendant Lavin was originally scheduled to self-surrender on Monday, April 3, 2023. On Sunday, April 2, 2023, Co-Defendant Lavin committed suicide.

Both Defendant and Co-Defendant Lavin had a salary of approximately $240,000 with no bonuses authorized. Under FMG's corporate structure, Ethos Group was the legal entity that would provide and sell vehicle service contracts ("VSCs") related to dealership sales. In turn, Ethos Group would send approximately $750 to FMG for each VSC sold. Agent Lapiano testified Defendant and Co-Defendant Lavin transferred approximately $28 million through Automated Clearing House ("ACH") transfers from FMG bank accounts to their own personal accounts. Agent Lapiano further testified that Defendant and Co-Defendant Lavin transferred approximately $20 million back to FMG accounts at various times and in various amounts when the dealerships

began to suffer. Agent Lapiano testified that these ACH transfers required a dual authorization and that Co-Defendant Lavin created a separate account using Randall Wadell's ("Mr. Wadell") email to use in authorizing these transfers. Mr. Wadell, a secretary and receptionist employed by FMG from 2015 to 2017, informed law enforcement that he caught Co-Defendant Lavin using his computer to create the separate authorization account. Law enforcement also discovered emails from Co-Defendant Lavin to different financial institutions to make Mr. Wadell the second authorizer for these ACH transfers. When confronted by FMG employees regarding issues with the QuickBooks accounting,[4] witnesses stated that Co-Defendant Lavin ran out of FMG's headquarters with his work laptop computer and never returned to FMG's offices.

During a proffer session, Co-Defendant Lavin provided a document purporting to be a compensation plan for Ethos that included a bonus structure for Co-Defendant Lavin. This bonus structure provided that $40 was to be paid to the CFO for each VSC sold. John Alexander ("Mr. Alexander"), FMG's previous CFO, informed law enforcement there was no bonus structure within Ethos for executives, as the only bonus structure was related to car sales and provided commissions to the car dealership employees. Mr. Alexander further informed law enforcement that during his employment with FMG, he had never seen a bonus structure for the CFO and he himself had not received a salary greater than $240,000 as CFO. Agent Lapiano further testified that FMG used ADP for payroll and to generate W-2 tax forms.[5] However, Defendant and Co-Defendant Lavin sent these $40 payments through ACH transfer to their personal accounts and did not pay taxes on such payments. During the proffer session, Co-Defendant Lavin admitted that he had forged Mr. Fenton's signature authorizing a lease for a personal apartment on behalf of

---

[4] QuickBooks is an accounting software package created and sold by Intuit Inc.

[5] ADP, created by Automatic Data Processing, Inc. ("ADP"), is an online payroll and tax software.

Defendant. Mr. Fenton informed law enforcement he had no knowledge of the lease and had not authorized the lease of a personal apartment for Defendant. Mr. Wadell also admitted to law enforcement that he notarized the signature of Mr. Fenton outside of Mr. Fenton's presence for this lease and that he did not have the authority to do so.

Agent Lapiano testified that Mr. Fenton did not authorize FMG or any other legal entity to utilize company credit cards. Defendant acquired several American Express credit cards on his own credit, naming them "Circle E Ranch" and "Fenton Motor Group". Defendant assigned these credit cards to FMG employees purportedly for FMG expenses. FBI agents and analysts conducted a review of these credit card charges and have conservatively estimated approximately $3 million in fraudulent charges for Defendant's own personal benefit. For example, Defendant purchased, *inter alia*, $100,000 in airline tickets for himself and his wife, several thousands of dollars in luxury clothing items, and tens of thousands of dollars in other personal items. Defendant and Co-Defendant authorized ACH transfers to their personal accounts to then pay for these credit card charges. Co-Defendant Lavin was the only one with access to FMG's QuickBooks accounting and labeled the transfers for these fraudulent charges as legitimate business expenses.

Agent Lapiano testified that Eslam Mohamed ("Mr. Mohamed"), an Egyptian national, was the personal driver for Defendant and is the owner and operator of Chic Limo and S&M Car Sales. Defendant paid Chic Limo approximately $300,000 for Mr. Mohamed's driving services. Defendant and Co-Defendant Lavin also added Mr. Mohamed and Mr. Mohamed's family to FMG's health insurance without Mr. Fenton's authorization. Agent Lapiano testified that the principal investigative arm of the U.S. Department of Homeland Security ("DHS"), Homeland Security Investigations ("HSI"), had previously stopped Mr. Mohamed on an unrelated case and contacted the FBI regarding the open investigation into Defendant. During HSI's review of Mr.

8

Mohamed's text messages on his cell phone, HSI agents discovered messages between Mr. Mohamed and Defendant regarding money transfers to Dubai. Mr. Mohamed's cell phone also contained an image purporting to be a screenshot of Defendant's Wells Fargo bank account showing an account balance of approximately $50 million. Agent Lapiano testified the bank records for this account were acquired and that there was not $50 million in Defendant's Wells Fargo bank account at the time of the purported screenshot. Defendant's communications with Mr. Mohamed revealed Defendant was trying to use Mr. Mohamed's connections with individuals overseas to obtain investors to purportedly purchase FMG. Defendant represented to Mr. Fenton that he planned on purchasing the car dealerships. Agent Lapiano testified that Defendant and Co-Defendant Lavin told multiple witnesses Mr. Fenton was to blame for FMG's business failures and that Mr. Fenton had mismanaged the car dealerships.

      Agent Lapiano further testified that, following the collapse of FMG in late 2018, Defendant setup additional fraud schemes to help pay for the multi-million dollar credit card debt he had accumulated. Defendant sought to cash counterfeit checks from O.M.G. Inc., a hardware and roofing company in Agawam, Massachusetts, in May 2019. Agent Lapiano testified these checks were to be used to pay for Defendant's credit card charges and included the following: $95,600 to Tiffany Springs Nissan; $195, 200 to Tiffany Springs Nissan; $95,600 to Expo Motor Group; and $65,000 to Circle E Ranch. All of these companies listed Defendant as the account holder and these payments were identified as fraudulent by the financial institutions and returned unpaid. In August 2019, Defendant mailed forty-nine U.S. Postal Money orders, each for the payment of $1,000, to an EMG employee. These U.S. Postal Money Orders state, "From Eslam Mohamed" and "Pay to EMG 001" at address "2415 E. Camelback Rd Ste 700 Phoenix, AZ 85016". Defendant instructed the EMG employee to deposit these U.S. Postal Money Orders into his EMG

001 LLC account at Chase Bank. However, Chase Bank closed this account before the EMG employee made the deposit. Agent Lapiano testified that a U.S. Postal Inspector confirmed these U.S. Postal Money Orders were forgeries.

In June 2020, Defendant opened five back accounts at BB&T under the names "EMG 001 LLC", "CCC Auto LLC", "Circle E Ranch', "Circle E Oil and Chemical LLC", and "Expo Motor Group LLC". Defendant applied for and received eight fraudulent Paycheck Protection Program ("PPP") loans to these five accounts amounting in total to $2,594,355. A former EMG employee reported there were approximately ten employees at EMG, and all were let go prior to the Covid-19 pandemic. Agent Lapiano testified that a number of these fraudulent loans were transferred from the above-listed accounts to different personal accounts owned by Defendant. These transfers included transfers totaling more than $150,000 to Mr. Mohammed's companies, Chic Limo and S&M Car Sales. Agent Lapiano testified there is an ongoing investigation by law enforcement in Maryland of a larger conspiracy related to PPP loans and fraudulent bank statements and tax forms, which is related to Defendant's own PPP loan scheme. Agent Lapiano further testified that prosecutors investigating Defendant's involvement in the PPP fraud conspiracy plan to indict Defendant for these offenses as well.

In November 2020, Defendant applied to receive $104,327.41 from the U.S. Department of Agriculture's ("USDA") Seafood Trade Relief Program purportedly through the Kimball Family Seafood Group operated by William Kimball. Defendant acquired a fraudulent Commercial Fisheries Entry Commission Permit Card in the name of William Kimball and insisted that payment be made in direct deposit rather than through check. USDA investigators were aware that this request was fraudulent and provided Defendant an ACH Vendor/Miscellaneous Payment Enrollment Form in which Defendant sought to deposit the funds in his account titled "CCC Auto

LLC Account 8981" at BB&T/Trust Bank. Agent Lapiano testified that during a deposition in December 2020 related to a civil lawsuit, Defendant testified that he owned a business in Dubai named Circle E Oil. During the deposition, Defendant testified that he became involved with Circle E Oil in approximately 2015, there were no other owners, the company had no employees, and the company bought and sold oil off the market to different traders in the Middle East.

Agent Lapiano testified Defendant was a danger to the community, a serious flight risk, and has a previous history involving fraud. Agent Lapiano testified Defendant was charged with Theft in 1998 for transferring approximately $50,000 from Superior Toyota, a car dealership, into a bank account controlled by him to pay for repairs to his car and to pay his wife's cell phone bill, and creating false sales to fraudulently collect commissions. Agent Lapiano further testified that Defendant was convicted in 1987 of Make/Pass Fictious Check and Forgery.

Agent Lapiano testified that following Defendant's arrest in the underlying matter, Defendant made calls from prison to his wife and son that was surveilled by law enforcement. Defendant directed his wife and son to write checks to themselves from his bank accounts. During these calls, Ms. Exposito told Defendant that his stepmother, a former United States Senator, was reaching out to her connections in the U.S. Department of Justice ("DOJ") to aid with Defendant's release. When informed Co-Defendant Lavin had committed suicide, Defendant expressed some sympathy but voiced concern that the entirety of the case against Defendant and Co-Defendant Lavin would now fall on him. During the phone call to his son and wife, Defendant told them Mr. Fenton and Co-Defendant Lavin were to blame for the fraud. The Government further proffered that Defendant has been untruthful with Pretrial Services and has not informed them of a number of assets he possesses including his real estate, horses, livestock equipment, and livestock.

During cross-examination, Agent Lapiano testified that the investigation of Defendant began in early 2019, and was opened originally in the Eastern District of Oklahoma. Agent Lapiano further testified that Mr. Fenton moved FMG's headquarters from Oklahoma to Frisco, Texas several years prior to the investigation. Agent Lapiano testified that Co-Defendant Lavin had been reported to be an alcoholic.

At the conclusion of the Hearing, the Court heard arguments from the Government and Defendant, respectively. The Government argued Defendant has a forty-year history of fraud and the Government has not yet discovered how Defendant created the forged U.S. Postal Money Orders. The Government further argued that Defendant has the means to flee and is facing an indictment in the District of Maryland for his fraudulent PPP loans. The Government argued Defendant has not been forthcoming with Pretrial Services and was not honest about his financial liabilities. Defendant proffered that Defendant's stepmother will support him, including paying for his legal defense. Defendant argued that Defendant's wife, his son, and his son's wife were present in Court to support Defendant. Defendant further proffered he has a stepdaughter that is very ill and that his presence is essential to the operation of his ranch.[6] Defendant offered to surrender his United States passport and represented that he is willing to submit to conditions of pretrial release, including restrictions on financial and internet activity. Defendant did not proffer a third-party custodian or any witness.

## IV.   SECTION 3142(g) FACTORS

The Court finds, based on the evidence presented, that the Government has proven by clear and convincing evidence that no condition or combination of conditions of release will reasonably

---

[6] During the Hearing, Defendant proffered that his stepdaughter is very ill and lives in the Phoenix, Arizona area. In reviewing the Pretrial Services Report (Dkt. 10), Defendant did not advise Pretrial Services that he has a stepdaughter or any stepchildren. *See generally id.* Defendant did advise he has a daughter, Alexandria Haley, from his previous marriage and that Alexandria Haley currently resides in Okinawa, Japan. *See id.* at 3.

assure the safety of the community, and by a preponderance of the evidence that no condition or combination of conditions of release will reasonably assure Defendant's appearance as required. Additionally, the Court finds, based on the evidence presented, Defendant poses a serious risk that he will obstruct or attempt to obstruct justice.

### A. The Nature and Circumstances of the Charged Offenses and the Weight of the Evidence

The weight of the evidence against Defendant is strong and reveals Defendant's participation in a number of fraud schemes. Additionally, the nature and circumstances of the charged offenses favor detention.

Agent Lapiano testified to the fraudulent ACH transfers from FMG accounts to Defendant and Co-Defendant Lavin's personal accounts. Additionally, Mr. Wadell told law enforcement he caught Co-Defendant Lavin using his computer to create a second authorization so as to allow Defendant and Co-Defendant to make the fraudulent ACH transfers. Mr. Wadell further advised law enforcement that he had authorized, outside of Mr. Fenton's presence, a lease for a personal apartment on behalf of Defendant. Mr. Alexander, the previous CFO of FMG, informed law enforcement that there had previously been no bonus structure and the bonus structure proffered by Co-Defendant Lavin underlying his and Defendant's fraud scheme was nonsensical, as executives did not receive commissions for individual car sales. Agent Lapiano testified HSI found communications between Mr. Mohamed, Defendant's personal driver, and Defendant regarding money transfers to Dubai and Defendant's forgery of a screenshot purporting to show Defendant had $50 million in his bank account. Agent Lapiano also testified that Defendant added Mr. Mohammed, Defendant's personal driver, and Mr. Mohamed's family to FMG's health insurance.

Following the collapse of FMG in late 2018, Defendant attempted several additional fraud schemes including: seeking to cash counterfeit checks from O.M.G. Inc.; forging U.S. Postal

13

Money Orders; fraudulently receiving PPP loans for five different false business bank accounts; and using forged documents to apply for the USDA's Seafood Trade Relief Program. Agent Lapiano testified to, and the Government presented evidence of, Defendant's attempted fraudulent transactions and his relationship to the bank accounts underlying the fraud schemes. Additionally, Agent Lapiano testified that a number of the companies created by Defendant had no employees and there were no other individuals who would have directed these false transactions. In sum, the weight of the evidence is strong and favors detention.

Furthermore, the nature and circumstances of the charged offenses weighs in favor of detention. In the present Indictment, Defendant faces charges of one count of violating 18 U.S.C. § 1349 (Conspiracy to Commit Wire Fraud) and twenty-two counts of violating 18 U.S.C. § 1343 (Wire Fraud). Additionally, the Government represented there is an indictment forthcoming out of Maryland related to Defendant's alleged involvement in a PPP loan conspiracy. Thus, if convicted, Defendant faces a lengthy possible sentence, which presents a motive to flee. *See United States v. Xu Jia Bao*, No. 3:17-CR-547, 2017 WL 6497885, at *2 (N.D. Tex. Dec. 19, 2017) (finding defendant charged with one count of wire fraud and one count of introduction of misbranded food into United States commerce had a "motive to flee" because he faced "a possible prison sentence of approximately 46-57 months" (citing *United States v. Stanford*, 630 F. Supp. 2d 751, 755 (S.D. Tex. 2009), *aff'd*, 341 F. App'x. 979 (5th Cir. 2009))); *see also United States v. Almasri*, Crim. A. No. H–07–155, 2007 WL 2964780, at *1 (S.D. Tex. Oct. 10, 2007) (finding the severity of potential ten-year sentence weighed in favor of detention).

Based on the evidence presented, the Court finds that the weight of the evidence to support the charged offenses and the nature and circumstances of these charges, favor detention.

### B. Defendant's History and Characteristics and the Nature and Seriousness of the Danger Posed by Defendant's Release

Defendant's criminal history and characteristics reveal a pattern of fraud. Furthermore, Defendant has shown an ability and sophistication to conduct several different fraudulent schemes and the Government has shown by clear and convincing evidence that Defendant poses a danger to the community.

Defendant has relevant criminal history to the charged offenses. In 1987, Defendant was convicted in California for Make/Pass Fictious Check and Forgery for which he received a sentence of four years probation and 180 days confinement. Approximately ten years later in 1998, Defendant was convicted in Kansas for Theft. Like the charged offenses, Defendant stole approximately $50,000 from Superior Toyota for the repair of his vehicle, to pay for his wife's cell phone bill, and to pay himself through false commissions. Additionally, at issue in this case, Defendant traveled in 2018 to Egypt and in 2020 to Dubai, allegedly for business. Agent Lapiano testified that Mr. Mohamed, an Egyptian national, communicated with Defendant regarding acquiring investors in the Middle East to purchase FMG and, significantly, regarding money transfers to Dubai. Defendant also testified during a deposition in December 2020 related to a civil lawsuit that his alleged oil trading business, Circle E Oil, is based in Dubai.

Troublingly, there are also a number of inconsistencies in Defendant's statements to Pretrial Services. Defendant advised Pretrial Services he has a monthly income of approximately $3,000 from his business, Circle E Ranch, since 2018. However, Defendant's car payments for the three vehicles purchased in 2022 *alone* exceed his monthly income and he has a negative monthly cash flow of $5,500. Defendant also did not advise Pretrial Services of his additional assets including his livestock, horses, and livestock equipment. Defendant does not appear to have reported the personal apartment that was leased on his behalf by way of the alleged underlying

15

fraud. Furthermore, Defendant did not disclose to Pretrial Services any of the purported businesses he was allegedly operating and for which he received PPP loans, including his alleged oil trading business, Circle E Oil. Defendant advised Pretrial Services his financial liabilities were unknown. However, this is inconsistent with the Government's investigation into Defendant, which revealed extensive credit card debt stemming from his alleged fraud schemes. The Government's presented evidence goes directly as to why Defendant may aver these liabilities were unknown—these liabilities are directly connected to the alleged fraud schemes for which he is presently charged and to additional possible charges related to fraudulent PPP loans. *See United States v. Karimov*, No. 4:20-CR-382, 2022 WL 1667037, at \*4 (E.D. Tex. May 24, 2022) ("The Court is particularly concerned by certain behavior [the defendant] has exhibited since being indicted—including apparent misrepresentations to Pretrial Services—which cast doubt on his character and suggest that he is likely to attempt to obstruct justice." (citing *United States v. Djoko*, No. CR19-0146-JCC, 2019 WL 4849537, at \*4 (W.D. Wash. Oct. 1, 2019); *United States v. Fattah*, 351 F.Supp.3d 1133, 1138 (N.D. Ill. 2019))). Additionally, Defendant's inconsistent statements regarding his financial assets, his communication with Mr. Mohamed regarding transferring funds to Dubai, his travel to Egypt in 2018 and Dubai in 2020 for business during his alleged fraud, the existence of his Dubai-based business, Circle E Oil, and the receipt of fraudulent loans for Circle E Oil are all strong evidence Defendant is a serious risk of flight.

The Court further concludes there is clear and convincing evidence that no set of conditions would ensure the safety of the community. The inquiry into whether Defendant is a danger to the community "permits consideration of a defendant's propensity to commit crime generally, 'even where only pecuniary and not physical harm might result to the community at large.'" *United States v. Ashley*, No. 4:20-CR-318, 2021 WL 1391447, at \*4 (E.D. Tex. Apr. 13, 2021), *aff'd*, 850

F. App'x 270 (5th Cir. 2021) (quoting *United States v. Parr*, 399 F. Supp. 883, 888 (W.D. Tex. 1975)). In the present case, Defendant has shown an ability to commit a large number of fraud schemes with a variety of methods. As part of their fraudulent transfers from FMG accounts to his personal accounts, Defendant and Co-Defendant Lavin circumvented the dual authorization requirements by creating a separate account for Mr. Wadell without his knowledge and confirming with financial institutions that Mr. Wadell was an authorizer. Co-Defendant Lavin would then cover up these transactions by labeling them as business expenses. Following FMG's collapse, Defendant set up several additional fraud schemes to pay for the significant credit card debt he accumulated during his fraud against FMG. Defendant created five false business bank accounts and applied for PPP loans totaling $2,594,355. Defendant also attempted to fraudulently obtain $49,000 from O.M.G. Inc., through counterfeit checks. Defendant further attempted to obtain funds through forged U.S. Postal Money Orders, and the Government has yet to discover how Defendant forged these U.S. Postal Money Orders. Defendant also applied to receive $104,327.41 from the USDA's Seafood Trade Relief Program using false documents and sought to have the USDA conduct an ACH transfer to accounts registered in his name. These schemes show Defendant's ability to engage in a wide variety of fraudulent methods and against different victims.

The Court is also troubled by Defendant's statements following his arrest that highlight there is a serious risk that he will obstruct justice. Following his arrest for the underlying offenses, during phone conversations from the jail with his wife and son, Defendant directed them to withdraw funds from his bank accounts. At the center of the charged offenses is Defendant's ability and willingness to transfer stolen funds and to transfer them to a wide network of his own accounts, some of which may be foreign accounts, as well as associates such as Mr. Mohamed. Furthermore, Agent Lapiano testified that Defendant used the stolen funds in purchasing luxury personal items

for his wife, Ms. Exposito, and their airline travel. Defendant's desire to immediately move funds, which may in fact be illicit proceeds at issue in this case, shows a willingness to obstruct justice and avoid possible restitution. *See Karimov*, 2022 WL 1667037, at *4. Additionally, Defendant and Ms. Exposito discussed his stepmother using her political connections to influence this case. Defendant's discussion, regardless of whether his stepmother in fact agreed to do so, shows a willingness to undermine court proceedings. These statements taken together cause serious doubt as to whether Defendant would comply with the Court's orders.

Ultimately, Defendant's ability and willingness to commit a wide array of fraud against different companies, financial institutions, and agencies using a network of bank accounts, coupled with his statements to his wife and son directing them to move funds immediately after his arrest, show he is a danger to the community and is willing to obstruct justice. Furthermore, Defendant's transfer of funds to Dubai, his international travel to Egypt and Dubai, his Dubai-based business, Circle E Oil, his ability to forge documents, and the large sum of money yet to be recovered all evidence he is a serious risk of flight.

## V. CONCLUSION

For the reasons stated herein, the Government's Motion for Detention is **GRANTED**. Defendant shall be detained pending trial and, is thus, remanded to the custody of the Attorney General or to the Attorney General's designated representative for confinement in a corrections facility separate, to the extent practicable, from persons awaiting or serving sentences or being held in custody pending appeal. Defendant must be afforded a reasonable opportunity for private consultation with defense counsel. On order of a court of the United States or on request of an attorney for the Government, the person in charge of the corrections facility must deliver

Defendant to a United States Marshal for the purpose of an appearance in connection with a court proceeding.

**So ORDERED and SIGNED this 10th day of April, 2023.**

_____
KIMBERLY C. PRIEST JOHNSON
UNITED STATES MAGISTRATE JUDGE